David GWYNN, Plaintiff,

v.

William CLUBINE, John Clubine, Michael Brunet, Kirk Hochrein, and Elio Scarponi, Defendants.

William Clubine, John Clubine, Michael Brunet, Kirk Hochrein, and Elio Scarpone, Plaintiffs,

v.

David Gwynn, Defendant.

Nos. 02–CV–073A, 02–CV–557A.

United States District Court, W.D. New York.

Jan. 26, 2004.

Phillips Lytle LLP, Alan J. Bozer and Kiseok Moon, of Counsel, Buffalo, NY, for Plaintiff/Defendant.

Chicchia & Fleming, LLP, Hamburg, NY (Andrew P. Fleming, of Counsel), Kilgore & Kilgore, Dallas, TX (John H. Crouch, IV and Theodore C. Anderson, of Counsel), for Defendants/Plaintiffs.

## ORDER

ARCARA, District Judge.

The above-referenced cases were referred to Magistrate Judge Leslie G. Foschio pursuant to 28 U.S.C. § 636(b)(1)(B), on March 8, 2002 and September 20, 2002, respectively. On December 24, 2003, Magistrate Judge Foschio filed a Report and Recommendation, recommending that plaintiff Gwynn's petition to vacate the arbitration award should be denied, that claimants' petition to confirm the arbitration award should be granted, and that the Clerk of Court be directed to close both cases.

The Court has carefully reviewed the Report and Recommendation, the record in this case, and the pleadings and materials submitted by the parties. No objections having been timely filed, it is hereby

ORDERED, that pursuant to 28 U.S.C. § 636(b)(1), and for the reasons set forth in Magistrate Judge Foschio's Report and Recommendation, Gwynn's petition to vacate the arbitration award is denied and claimants' petition to confirm the arbitration award is granted. The Clerk of Court is directed to take all steps necessary to close both cases.

IT IS SO ORDERED.

## DECISION and ORDER

## REPORT and RECOMMENDATION

FOSCHIO, United States Magistrate Judge.

### *JURISDICTION*

These actions were referred to the undersigned by Honorable Richard J. Arcara on March 8, 2002 (02–CV–00073A(F)), and September 20, 2002 (02–CV–00557A(F)), for pretrial matters including report and recommendation on dispositive motions. The matters are presently before the court on motions filed on January 31, 2003 by Defendants/Plaintiffs to strike (02–CV–00073A(F), Doc. No. 31; 02–CV–00557A(F), Doc. No. 62), on February 11, 2003 by Plaintiff/Defendant to strike (02–CV–00073A(F), Doc. No. 34), on February 28, 2003 by Plaintiff/Defendant to sever (02–CV–00073A(F), Doc. No. 38; 02–CV–00557A(F), Doc. No. 66), and on March 3, 2003 by Defendants/Plaintiffs to modify the scheduling order (02–CV–00073A(F),

Doc. No. 41; 02–CV–00557A(F), Doc. No. 71).[1]

## BACKGROUND

Plaintiff/Defendant David Gwynn ("Gwynn"), was the respondent in an arbitration proceeding ("the arbitration proceeding") brought by Defendants/Plaintiffs William R. Clubine ("William Clubine"), John Clubine ("John Clubine"), Michael Brunet ("Brunet"), Kirk Hochrein ("Hochrein") and Elio Scarponi ("Scarponi") (together, "Claimants"), in the National Association of Securities Dealers. Gwynn's co-respondents in the arbitration proceeding included Fox & Co., Inc., James Moldermaker and Southwest Securities, Inc. The arbitration proceeding award, issued on December 26, 2001 ("the Arbitration Award"),[2] holds Gwynn and the co-respondents jointly and severally liable to Claimants for $ 955,742 for losses Claimants incurred from the sale of certain securities.[3]

On January 23, 2002, Claimants commenced in the Northern District of Texas an action against the arbitration co-respondents, *Clubine v. Fox & Company Investments, Inc.* ("*Clubine*"), seeking an order confirming the Arbitration Award. On August 1, 2002, *Clubine* was transferred to the Western District of New York, for improper venue, where it was assigned civil case No. 02–CV–00557A(F).

On January 25, 2002, Gwynn commenced *Gwynn v. Clubine*, 02–CV–0073A(F) ("*Gwynn*"), in this court, seeking an order vacating the Arbitration Award. On August 28, 2002, *Gwynn* and *Clubine* were consolidated with two related actions, including *Fox & Co., Inc. v. Clubine*, 02–CV–00072A(F) ("*Fox & Co.*"), and *Southwest Securities, Inc. v. Clubine*, 02–CV–00070A(F) ("*Southwest Securities*"). Settlement discussions ensued in the consolidated action.

A Scheduling Order filed on August 29, 2002 and pertaining to the consolidated action establishes the following deadlines: October 28, 2002 for filing responses to the petitions seeking to vacate or to confirm the Arbitration Award, November 27, 2002 for filing any replies to the responses, and December 13, 2002, for filing any sur-replies in further support of the petitions to vacate or to confirm the Arbitration Award.

On November 4, 2002, Gwynn filed in support of his petition to vacate the Arbitration Award the affidavit of Alan J. Bozer, Esq. (Doc. No. 28) ("Bozer Affidavit"), and a Memorandum of Law in Support of Motion to Vacate Arbitration Award and Opposing Motion to Confirm (*Gwynn*, Doc. No. 29) ("Plaintiff's Memorandum"). On January 31, 2003, Claimants cross-filed a motion to strike portions of the Bozer Affidavit (*Gwynn*, Doc. No. 31; *Clubine*, Doc.

---

1. Although the motions to strike and to sever are nondispositive, as the facts on which such motions are predicated are highly relevant to the merits of the pending petitions to vacate or to confirm an arbitration award, the court considers the nondispositive motions to strike and to sever in the Report and Recommendation addressing the petitions.

2. A copy of the Arbitration Award is attached as an exhibit both to Gwynn's Petition to Vacate the Arbitration Award as well as to Claimants' Motion to Confirm the Arbitration Award.

3. Although the arbitration panel did not specify in the Arbitration Award the legal theory on which co-respondents were found liable to Claimants, the Arbitration Award does specify that Claimants asserted several causes of actions against co-respondents including "churning, excessive markups and markdowns, failure to execute stop loss orders, breach of contract, breach of fiduciary duty, negligence, gross negligence, conspiracy and fraud." Arbitration Award at 2.

No. 62), and a Memorandum of Law In Support of Motion to Confirm and Opposing Petition to Vacate (*Gwynn*, Doc. No. 32; *Clubine*, Doc. No. 63) ("Claimants' Memorandum").

Settlements were reached in the *Fox & Co.* and *Southwest Securities* actions and, on February 5, 2003, *Fox & Co.* and *Southwest Securities* were closed by stipulation and order of the court signed by Judge Arcara. On February 11, 2003, Gwynn filed a motion to Dismiss and to Strike Motion Papers Filed by Claimants on January 31, 2003 or for Alternative Relief (*Gwynn*, Doc. No. 34). Attached to the motion to strike is a supporting affidavit of Alan J. Bozer, Esq. ("Bozer Affidavit Supporting Motion to Strike"). The motion was also accompanied by a Memorandum of Law in Support of Plaintiff David Gwynn's Motion to Dismiss and to Strike Motion Papers Filed by Plaintiffs on January 31, 2003 or For Alternative Relief (*Gwynn*, Doc. No. 35) ("Plaintiff's Memorandum Supporting Motion to Strike").

On February 27 and 28, 2003, Gwynn cross-filed in both *Gwynn* and *Clubine*, respectively, a Memorandum of Law Opposing Motion to Strike (*Gwynn*, Doc. No. 36; *Clubine*, Doc. No. 69) ("Plaintiff's Memorandum Opposing Motion to Strike"), and the Declaration of Alan J. Bozer, Esq., in Opposition to Claimants' Motion to Strike Affidavit Filed on January 31, 2003 (*Gwynn*, Doc. No. 37; *Clubine*, Doc. No. 70).

On February 28, 2003, Gwynn cross-filed in both *Gwynn* and *Clubine* the same motion (*Gwynn*, Doc. No. 38; *Clubine* Doc. No. 66), seeking to sever *Gwynn* and *Clubine* from *Fox & Co.* and *Southwest Securities,* and also requested that nine volumes containing the arbitration hearing proceedings filed in *Fox & Co.*[4] remain available for reference by the court in connection with the court's consideration of *Gwynn* and *Clubine*. Gwynn also cross-filed on February 28, 2003, in both *Gwynn* and *Clubine*, the same Reply Memorandum of Law in Support of Petition to Vacate Arbitration Award and in Opposition to Motion to Confirm Arbitration Award (*Gwynn*, Doc. No. 39; *Clubine*, Doc. No. 67) ("Gwynn's Reply Memorandum"), and the same Reply Declaration of Alan J. Bozer, Esq., in Support of Petition to Vacate Arbitration Award and in Opposition to Motion to Confirm Arbitration Award (*Gwynn*, Doc. No. 40; *Clubine*, Doc. No. 68) ("Bozer Reply Declaration").

On March 3, 2003, Claimants cross-filed in both *Gwynn* and *Clubine* a Response to Motion to Dismiss and Strike Papers, and Cross–Motion to Modify Scheduling Order (*Gwynn*, Doc. No. 41; *Clubine*, Doc. No. 71) ("Claimants' Response Opposing Motion to Dismiss and Strike"). On March 5, 2003, Claimants cross-filed in both *Gwynn* and *Clubine* the Declaration of John H. Crouch, IV (*Gwynn*, Doc. No. 42; *Clubine*, Doc. No. 74) ("Crouch Declaration").

Based on the following, Gwynn's motion to strike (*Gwynn*, Doc. No. 34), is DENIED; Gwynn's motion to sever (*Gwynn*, Doc. No. 38; *Clubine*, Doc. No. 66), is DISMISSED as moot in part and GRANTED in part; Claimants' motion to strike (*Gwynn*, Doc. No. 31; *Clubine*, Doc. No. 62), is GRANTED; Claimants' motion to modify the scheduling order (*Gwynn*, Doc. No. 41; *Clubine*, Doc. No. 71), is GRANTED *nunc pro tunc.* Gwynn's petition to vacate the Arbitration Award (*Gwynn*, Doc. No. 1), should be DENIED; Claimants' petition to confirm the Arbitration Award (*Clubine*, Doc. No. 1), should be GRANTED. The Clerk of the Court

---

**4.** "Arbitration Record" references are to the arbitration record proceedings submitted in nine volumes in 02–CV–00072A(F) (*Fox & Co.*).

should be directed to close both cases, 02–CV–0073A(F) and 02–CV–00557A(F).

### FACTS[5]

Plaintiff David Gwynn is a registered representative licensed with the National Association of Securities Dealers ("NASD"), under the rules of which Gwynn is subject to arbitration upon a customer's complaint. Claimants are Canadian citizens residing in the vicinity of Toronto. Claimant William R. Clubine ("William Clubine") met Gwynn in Arizona in 1994 when Gwynn was a vice president and securities broker at Fox & Company Investments, Inc. ("Fox"), and who worked out of Fox's office in Phoenix, Arizona. Fox contracted with Southwest Securities, Inc. ("Southwest"), to perform clearing functions for trades executed by Fox. Under NASD rules, the contractual relationship between Fox and Southwest is governed by a clearing agreement.

William Clubine and the other Claimants opened brokerage accounts at Fox with Gwynn. William Clubine was authorized by the other Claimants to order trades on behalf of all claimants in their margin accounts. The accounts were "margin" accounts whereby Claimants invested in income-generating securities, acquired through debt financing for their purchase. The Margin and Short Customer Account Documents ("Margin Account Documents")[6] Claimants executed in opening the margin accounts grants Southwest discretion to sell any and all securities to satisfy the Claimants' securities acquisition debt obligations. Margin Account Document, ¶¶ 6, 7, 13–15. Southwest Securities was granted a lien on the securities purchased thereunder on behalf of Claimants and the discretion to liquidate such securities to enforce the security interest. *Id.* The customer, *i.e.*, each Claimant, was personally responsible for any debt balance remaining upon liquidation of a margin account. *Id.* ¶ 14. The Margin Account Documents further provided that by maintaining their margin accounts, the Claimants agreed to submit any disputes regarding their margin accounts to arbitration in accordance with the Federal Arbitration Act. *Id.* ¶ 12. The Margin Account Documents include a "ten-day clause" providing that customer account confirmations of transactions and statements are binding upon the customer unless the customer objects, in writing, within ten days after the customer receives notice of the transaction. *Id.* ¶ 18. The Margin Account Documents further provide that the rights and liabilities of the parties are to be construed under the laws of the State of Texas. *Id.* ¶ 20.

At the center of this dispute are various investments Claimants made in the common stock of Arakis Energy Corporation ("Arakis"), an oil company that was publicly traded on both the NASDAQ stock exchange and the Vancouver securities exchange. Claimants invested in more than 100,000 shares of Arakis stock on margin, *i.e.*, financed through Claimants' borrowing from Fox, *i.e.*, debt acquisition. During 1995, Arakis's stock price rose from $ 4 per share to more than $25 per share, but the price began to fluctuate in August 1995 and on August 12, 1985, trading of the stock was halted for thirty days. At that time, the stock was trading at $ 12 per share. Trading resumed one month later

---

5. The fact statement is taken from the pleadings and motion papers filed in the actions.

6. Copies of the Margin Account Document are attached as Tab 9 of Vol. 6 of the Arbitration Record, as well as Tab 3 to Exh. A of the

Affidavit of James Moldermaker, which is attached as Exh. 2 to the Appendix to Defendant Fox & Company's Motion to Dismiss or Transfer, 02–CV–557A(F), Doc. No. 21.

with the stock reopening at $ 6 per share. Claimants acquired the Arakis stock during the period at prices ranging from $ 4 to $ 25 per share. As Claimants' positions on the Arakis stock were margined, Southwest, in accordance with the Margin Account Documents, liquidated all of Claimants' Arakis stock resulting in losses to Claimants. After liquidation, Claimants became personally indebted to Fox for money owed on the margin debt based on the Margin Account Documents.

Claimants filed, pursuant to the arbitration clause in the Margin Account Documents, an arbitration claim with NASD on October 9, 1998, seeking $ 2,491,694 in damages. The NASD assigned the arbitration case for further proceedings in Buffalo, New York. An arbitration panel consisting of three NASD arbitrators commenced a hearing on October 25, 2000, which continued for thirteen sessions over the course of the year, concluding on October 10, 2001. At the hearing, Claimants presented evidence that they were unsophisticated investors who relied on presentations made by Gwynn regarding the Arakis stock, that Claimants believed in late July 1995, Gwynn had executed a stop-loss order directing Claimant's shares of Arakis stock be sold if the per share price fell to $ 18, that Gwynn and the Co-Respondents engaged in "churning" Claimants' accounts, i.e., aggressive trading whereby shares of a stock are sold and repurchased within a short span of time to take advantage of volatile fluctuations in price, and that William Clubine, who was authorized on behalf of all the Claimants to order trades on their respective accounts, was vacationing in a remote area of Canada and, thus, not available by telephone for a period of time immediately preceding the halting of Arakis stock trading. In contrast, Gwynn maintained that Claimants were aggressive, speculative traders who often engaged in "churning" with regard to

other stocks, that Claimants never placed a "stop loss" order on the Arakis stock, that William Clubine was not authorized on behalf of the other Claimants to order trades on their respective accounts, that Claimants failed to object to in writing within ten days of the subject Arakis stock transactions, and that telephone records demonstrating numerous calls were placed between William Clubine and the other Claimants when William Clubine was allegedly on vacation and unreachable by telephone were never made available.

On December 26, 2001, the arbitration panel ruled in favor of Claimants, awarding $ 787,000 in compensatory damages, $ 150, 742 in attorneys' fees and $ 18,000 in expert witness fees. The panel also imposed interest on the award amount at the rate of 6% from the date of the award.

## DISCUSSION

### 1. Motion to Sever

As stated, on February 28, 2003, Gwynn filed motions in both *Gwynn* (Doc. No. 38) and *Clubine* (Doc. No. 66) to sever *Gwynn* and *Clubine* from the *Fox & Co.* and *Southwest Securities* actions, and also requested that the arbitration hearing record contained in nine volumes and filed in *Fox & Co.* remain available for reference by the court in connection with the court's consideration of *Gwynn* and *Clubine*. As the two cases from which Gwynn seeks to sever the instant action, i.e., *Fox & Co.* and *Southwest Securities*, have been closed pursuant to stipulation and orders, the motions filed in *Gwynn* (Doc. No. 38) and *Clubine* (Doc. No. 66), are DISMISSED as moot insofar as severance is sought.

As to the request that the nine volumes containing the arbitration proceedings record and filed in *Fox & Co.* remain available for use by the court in connection with

*Gwynn* and *Clubine,* that the arbitration proceedings record was filed while the motions to consolidate the related cases were pending before the court demonstrates the parties' expectations that such record was relevant to all the consolidated cases. Furthermore, Claimants have not challenged the authenticity of the arbitration proceedings record. Accordingly, the motions filed in *Gwynn* (Doc. No. 38) and *Clubine* (Doc. No. 66), are GRANTED insofar as Gwynn requests that the nine volumes containing the arbitration proceedings record filed in *Fox & Co.* remain available for use by the court in connection with *Gwynn* and *Clubine.*

### 2. *Motions to Strike*

■ Claimants cross-filed a motion to strike (*Gwynn,* Doc. No. 31; *Clubine,* Doc. No. 66) ("Claimants' Motion to Strike"), seeking to strike portions of the Bozer Affidavit on the basis that statements contained therein do not comply with Fed. R.Civ.P. 56(e) as they are not based on personal knowledge and, as such, are inadmissible hearsay or generalized conclusory statements. Claimants further maintain that Bozer's "apparent legal conclusions are not supported by the record, and therefore cannot qualify as competent and reliable expert testimony." Claimants' Motion to Strike at 2. Gwynn filed in response a motion to strike Claimants' Motion to Strike (*Gwynn,* Doc. No. 34) ("Gwynn's Motion to Strike"), on the basis that Claimants' Motion to Strike was not timely filed.[7]

■ As stated, Claimants' Motion to Strike is predicated on Fed.R.Civ.P. 56(e) which provides that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall

show affirmatively that the affiant is competent to testify to the matters stated therein." Accordingly, a court may strike portions of an affidavit that are not based upon the affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements. *United States v. Private Sanitation Industry Ass'n of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.1995).

■ Rule 56(e), however, applies to motions for summary judgment, none of which have been filed in either *Gwynn* or *Clubine.* Moreover, nowhere within the procedures governing petitions to confirm or vacate an arbitral decision is the submission of a supporting affidavit by the petitioning party required. *See* 9 U.S.C. § 1 *et seq.* Rather, the affidavit at issue is governed by Fed.R.Civ.P. 11 which provides in relevant part that all papers filed with the court in an action be signed by the attorney of record and that by signing such paper, the attorney certifies to the court

> (b) ... that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, -
>
> > (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
> >
> > (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
> >
> > (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a

---

7. Gwynn did not cross-file in *Clubine* his mo- tion to strike Claimants' Motion to Strike.

reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

Fed.R.Civ.P. 11(b)(1)-(4).

Significantly, unlike Fed.R.Civ.P. 56(e), Fed.R.Civ.P. 11 does not require that affidavits be based upon personal knowledge, but may be based on a reasonable belief upon inquiry into the relevant circumstances. Fed.R.Civ.P. 11(b). As to the "apparent legal conclusions" contained in the Bozer Affidavit, Fed.R.Civ.P. 11(b)(2) specifically provides for stating legal contentions in an affidavit, provided such contentions are not frivolous. *See Margo v. Weiss*, 213 F.3d 55, 64 (2d Cir.2000) ("[T]he 1993 Advisory Committee Note explains that Rule 11(b)(2) 'establishes an objective standard, intended to eliminate any "empty-head pure-heart" justification for patently frivolous arguments.'") (quoting *Simon DeBartolo Group v. Richard E. Jacobs Group*, 186 F.3d 157, 166 (2d Cir. 1999)). Furthermore, insofar as Claimants assert that based on a lack of evidence in the record, Bozer's "apparent legal conclusions ... cannot qualify as competent and reliable expert testimony," Claimants' Motion to Strike at 2, the court observes that Bozer has not held himself out as an expert witness. As such, this aspect of Claimants' argument is without merit.

Accordingly, Claimants' motions to strike portions of the Bozer Affidavit

(*Gwynn*, Doc. No. 31; *Clubine*, Doc. No. 66) are DENIED. Gwynn's motion to dismiss and to strike Claimants' motion to strike (*Gwynn*, Doc. No. 34) is therefor DISMISSED as moot.

### 3. *Motions to Vacate or to Confirm Arbitration Award*

As stated, Gwynn has petitioned the court to vacate the Arbitration Award, whereas Claimants have petitioned the court to affirm the Arbitration Award. The parties essentially dispute whether the arbitrators manifestly disregarded the relevant law and evidence in the record.

■■■ "[T]he confirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court." *Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir.1997) (internal quotation marks omitted). The district court's review of an arbitration award is governed by the Federal Arbitration Act (the "FAA"), under which a court must confirm an award upon proper application unless the award is vacated, modified or corrected on grounds specified in the statute. *See* 9 U.S.C.A. § 9.[8] The FAA provides several grounds for vacating an arbitral decision including "where the arbitrators were guilty of misconduct in ... refusing to hear evidence pertinent and material to the controversy ...." 9 U.S.C. § 10(a)(3). In addition to the statutory grounds, an arbitral decision may also vacated "when an arbitrator has

**8.** 9 U.S.C. § 9 provides, in pertinent part:
[i]f the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title. If no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made.

exhibited a 'manifest disregard of law.'" *Westerbeke Corporation v. Daihatsu Motor Co., Ltd.*, 304 F.3d 200, 208 (2d Cir. 2002) (quoting *Wilko v. Swan*, 346 U.S. 427, 436, 74 S.Ct. 182, 98 L.Ed. 168 (1953)). It is these two grounds on which Gwynn relies in seeking to vacate the Arbitration Award. Plaintiff's Memorandum at 11–12.

■ Preliminarily, the court observes some confusion between the parties as to the documents filed in these actions. The initial document filed in case No. 02–CV–00557A(F) is denominated as a "Motion to Confirm Arbitration Award." (Doc. No. 1, 02–CV–00557A(F)). The initial document filed in case No. 02–CV–00073A(F) is denominated as a "Petition" to vacate the Arbitration Award. (Doc. No. 1, 02–CV–00073A(F)). Pursuant to 9 U.S.C. § 12, however, the proper vehicle by which to request vacating an arbitration award is a motion. Accordingly, the court will refer to Gwynn's "Petition" to vacate as a "motion." Furthermore, both Gwynn and Claimants refer to their perspective motions as governed by Fed.R.Civ.P. 56 which, as previously noted, pertains to motions for summary judgment. Neither Gwynn nor the Claimants point to any law establishing that Rule 56 applies to a motion to confirm or to vacate an arbitration award and the court's research reveals none. Accordingly, the court will not address the motions to confirm or to vacate the Arbitration Award as within the rubric of Rule 56.

■ The Second Circuit has held that "[t]he showing required to avoid summary confirmation of an arbitration award is high, and a party moving to vacate the award has the burden of proof." *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 12 (2d Cir.1997) (internal quotations omitted). *See also Westerbeke Corp., supra*, at 209 ("The party seeking vacatur bears the burden of proving manifest disregard."). "Arbitration awards are subject to very limited review in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *Willemijn Houdstermaatschappij, BV, supra*, at 12. As such, "the court's function in confirming or vacating an arbitration award is severely limited." *Id.*

### A. *Manifest Disregard of the Law*

■ The standard of review for vacating an award under the judicially created doctrine of manifest disregard of law is "severely limited." *Westerbeke Corp., supra*, at 208. The manifest disregard of the law doctrine "is limited only to those exceedingly rare instances where some egregious impropriety on the part of the arbitrators is apparent, but where none of the provisions of the FAA apply." *Duferco International Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 389 (2d Cir.2003). Application of the doctrine requires more than "simple error in law or a failure by the arbitrators to understand or apply it; and, it is more than an erroneous interpretation of the law." *Id.* To vacate an arbitration award for manifest disregard of the law, the court must find "'something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand or apply the law.'" *Id.* (quoting *Saxis S.S. Co. v. Multifacs Int'l Traders, Inc.*, 375 F.2d 577, 582 (2d Cir.1967)). Vacatur for manifest disregard of the law requires proof that "the arbitrators were fully aware of the existence of a clearly defined governing legal principle, but refused to apply it, in effect, ignoring it." *Id.* (citing cases).

■ Application of the manifest disregard of law standard involves a two-prong test, including an objective and a subjective prong. *Westerbeke Corp., supra*, at

209. The objective prong includes "whether the governing law alleged to have been ignored by the arbitrators was well defined, explicit, and clearly applicable." *Id.* (internal quotations and brackets omitted). The subjective prong requires "knowledge actually possessed by the arbitrator," *i.e.,* that the arbitrators "appreciate the existence of a clearly governing legal principle but decide to ignore or pay no attention to it." *Id. See Duferco Int'l Steel Trading, supra,* at 390 (stating the manifest disregard of law doctrine requires three inquiries, including (1) whether the allegedly ignored law was clear and explicitly applicable to the matter before the arbitrators; (2) whether the clear and explicitly applicable law was in fact improperly applied; and (3) whether the arbitrators actually possessed knowledge of the law).

▮▮▮▮▮ In the instant case, the arbitrators did not disclose any reasons for the decision, and the Second Circuit recognizes that this standard of review "is difficult to apply ... when arbitrators give no explanation for their decision." *Willemijn Houdstermaatschappij, BV, supra,* at 12. In such cases, "a reviewing court can only infer from the facts of the case whether the arbitrators appreciated the existence of a clearly governing legal principle but decided to ignore or pay no attention to it." *Id.* at 12–13 (citing *Merrill Lynch, Pierce, Fenner & Smith v. Bobker,* 808 F.2d 930, 933 (2d Cir.1986)). The court must confirm the arbitrators' decision if a ground for the challenged decision can be inferred from the facts of the case, even if such ground is based on an error of fact or of law. *Willemijn Houdstermaatschappij, BV, supra* at 12 (citing *Sobel v. Hertz, Warner & Co.,* 469 F.2d 1211, 1214 (2d Cir.1972), and *Siegel v. Titan Indus. Corp.,*

779 F.2d 891, 892 (2d Cir.1985)). A court may also infer manifest disregard of law if the arbitrators' error "is so obvious that it would be instantly perceived by the average person qualified to serve as an arbitrator." *Id.* (citing *Merrill Lynch, supra,* at 933). Determining whether to make such an inference "is not an easy task" and the court must confirm the arbitration award if there is " 'even a barely colorable justification for the outcome reached.' " *Id.* (quoting *Matter of Andros Compania Maritima, S.A. of Kissavos (Marc Rich & Co., A.G.),* 579 F.2d 691, 704 (2d Cir.1978)). In the instant case, there is at least one "barely colorable justification" for the arbitration award.

▮▮▮▮ In support of his motion to vacate the Arbitration Award, Gwynn points to Claimants' failure to object in writing to any trading or lack of trading for more than three years after the transactions at issue in this case. Plaintiff's Memorandum at 13–14. According to Gwynn, such failure is contrary to the contractual provisions of the account opening documents, specifically, the Margin and Short Account Customer Document ("the Margin Account Document") governing Claimants' accounts with Fox. *Id.*

In support of the motion to confirm the Arbitration Award, Claimants maintain that Gwynn failed to ensure that Moldermaker executed a "stop loss" order directing the sale of Claimants' shares of Arakis stock if the per share price fell to $ 18. Claimants' Memorandum at 7–11. According to Claimants, Gwynn's failure to see to the execution of the "stop loss" order supports several legal theories under Texas law[9] on which Claimants could recover, including common law claims for breach of

---

**9.** According to the Margin Account Document's choice of law provision, any claims involving the Margin Account Document are to be resolved according to the laws of the State of Texas. Margin Account Document ¶ 20.

contract, negligence, and breach of fiduciary duty, and statutory fraud in violation of Tex. Bus. & Com.Code § 27.01. *Id.* at 15–20. Gwynn does not dispute that a failure to execute a "stop loss" order would support recovery under such legal theories but, instead, maintains that Claimants' "stop loss" order argument is a "red herring" as the record does not establish that the order ever existed. Plaintiff's Reply Memorandum at 6–7. As Gwynn does not dispute that the failure to execute a requested "stop loss" order would support a recovery under Texas law based on breach of contract, negligence, breach of fiduciary duty, or statutory fraud, the court will not discuss those theories. Rather, the court focuses first on the applicability of the Margin Account Document's requirement that Claimants object to an unauthorized transaction in writing within ten days, and second on whether the evidence can be construed as demonstrating that Gwynn failed to see to the execution of a "stop loss" order.

Gwynn relies on *Modern Settings, Inc. v. Prudential–Bache Securities, Inc.,* 936 F.2d 640 (2d Cir.1991), in support of his petition to vacate the Arbitration Award for manifest disregard of law. In *Modern Settings, supra,* the Second Circuit held that the provision of a securities agreement between a broker and a customer requiring the customer to object in writing to unauthorized trades within ten days of receiving an account statement advising of the trade was enforceable, and the customer's failure to timely object in writing foreclosed the customer from asserting a claim alleging unauthorized trading. *Modern Settings, supra,* at 645. In denying the unauthorized trading claim, the court stated

> "[t]he purpose of the ten-day written complaint clause in the customer agreement is to require the customer to memorialize his or her complaint soon after

receipt of the account statement rather than waiting to see if the trade is profitable. The writing requirement of the clause insures that unauthorized trading disputes are not relegated to 'swearing contests' between broker and customer. For these reasons, broker-customer agreements requiring written notice of objections within a limited amount of time after the customer receives confirmation of the transaction *generally* have been enforced by courts".

*Modern Settings, supra,* at 646 (italics added).

In the instant case, Gwynn asserts that the arbitrators were made aware of the Margin Account Documents' contractual provision that objections to any trading be made in writing within ten days of the challenged transaction. In particular, Gwynn referenced the *Modern Settings* case both in a pre-arbitration hearing brief correspondents Moldermaker and Fox submitted to the arbitration panel, and at the arbitration hearing Gwynn's attorney, Bozer, quoted from *Modern Settings* in support of Gwynn's position regarding the ten-day rule. Plaintiff's Memorandum at 16–17. According to Gwynn, the arbitrators' failure to uphold the ten-day written complaint clause in the Margin Account Documents with regard to the challenged Arakis stock trades establishes the arbitrators failed to apply clearly established law to the facts of the case. Claimants do not deny either that they failed to submit any written complaints within ten days of the challenged Arakis stock trades, or that the arbitrators were made aware of *Modern Settings.* Nevertheless, Gwynn's argument on this point in support of his petition to vacate the Arbitration Award is without merit as a plain reading of *Modern Settings* reveals that the absence of a sufficiently "well defined, explicit, and clearly applicable" law requiring application of the

ten-day written complaint clauses such that the arbitrators' failure to apply the clause to the facts of the instant case amounted to manifest disregard of the law. *Westerbeke Corp., supra,* at 209.

Specifically, the Second Circuit's observation that so-called ten-day written complaint clauses *"generally* have been enforced by courts" and that certain circumstances warrant "a flexible application of such written notice clauses," *Westerbeke Corp., supra,* at 209, indicates that courts have discretion as to whether to enforce such clauses. That the court identified two situations warranting flexible application, including the existence of "a disparity in sophistication between a brokerage firm and its customer," as well as where "the broker's own assurances or deceptive acts forestall the customer's filing of the required written complaint," *id.,* but did not state that "flexible application" was appropriate only in the two specified situations, demonstrates that other situations may also warrant "flexible application" of the rule. Accordingly, the application of a ten-day written complaint clause is not a sufficiently "well defined, explicit, and clearly applicable" law such that the arbitrators were required to uphold the clause in the Margin Account Document and there is no basis on which to find that "the arbitrators appreciated the existence of a clearly governing legal principle but decided to ignore or pay no attention to it." *Willemijn Houdstermaatschappij, BV, supra,* at 12–13 (citing *Bobker, supra,* at 933). The arbitrators' failure to apply the clause to the facts of the instant case thus does not amount to a manifest disregard of law. *Westerbeke, supra,* at 209.

▮ Alternatively, even if the application of a ten-day written complaint clause

is a sufficiently well defined, explicit and clearly applicable governing legal principle such that the arbitrators were required to apply it, the Arbitration Award must be upheld if there exists at least "'a barely colorable justification for the outcome reached,'" *Willemijn Houdstermaatschappij, BV, supra,* at 12–13 (quoting *Matter of Andros Compania Maritima, S.A. of Kissavos, supra,* at 704,) even if such justification "is based on an error of fact or an error of law." *Id.* (quoting *Siegel, supra,* at 892–93). In the instant case, a "barely colorable justification for the outcome reached" exists, specifically, that the Claimants were unsophisticated investors who did not perceive the importance of objecting in writing to the challenged Arakis stock transactions.

In particular, there are conflicting accounts in the record as to whether Claimants were unsophisticated investors without significant trading investment experience, or were aggressive, speculative traders. Specifically, exhibits presented during Claimants' arbitration opening statement indicate that Claimants were "unsophisticated investors" given that (1) William Clubine had a tenth grade education, five years of investment experience, and engaged in his first options trading with Fox at Gwynn's suggestion; (2) Hochrein had an art degree, was a partner in an electrical consulting firm and, in 1995, had two years of investment experience; (3) Scarpone, who had a grade school education, owned a truck transmission repair business and Arakis was the first publicly traded stock Scarpone ever owned; (4) Brunet's college education was in physics and Brunet had not previously maintained any brokerage account; and (5) Arakis stock was only the second stock ever purchased by John Clubine, who had an eleventh grade education. Arbitration Record, Vol. 1, Tab

1. In contrast, Gwynn presented at the arbitration hearing investment account statements as evidence that Claimants were aggressive, speculative investors. Plaintiff's Memorandum at 4 (citing Arbitration Record, Vol. 5, Tabs 2, 3 and 6 (Hochrein's investments), and Vol. 6, Tabs 16 and 17 (William Clubine's investments)). Gwynn further maintains that upon cross examination at the arbitration hearing, Hochrein testified to a history of high risk investment on short term trading. Plaintiff's Memorandum at 4 (citing Arbitration Record, Vol. 1, Tab 7 at 678).

Contrary to Gwynn's assertions, the account statements pertaining to other investments made by William Clubine and Hochrein prior to opening accounts with Fox do not demonstrate that Claimants were "aggressive, speculative investors." Rather, such statements demonstrate only that William Clubine and Hochrein maintained margin investment accounts with other securities brokers prior to opening their margin accounts with Fox. Significantly, it is not clear from the statements that William Clubine and Hochrein routinely made money or achieved some other financial objective through such investments. Nor does Hochrein's arbitration testimony regarding his history of high risk investment on short term trading establish Hochrein's level of investment sophistication. Rather, Hochrein testified that Hochrein invested in Cepeda Minerals and that such investment was made at the suggestion of a friend. Arbitration Record, Vol. 1, Tab 7 at 677. When asked whether Hochrein felt "competent" in determining whether to invest in Cepeda Minerals, Hochrein replied: "No, not really. I went on her advice. Why would she steer me wrong? I did business with her on the electrical side, and she became kind of a friend, associate, and she had owned it herself. Why would she steer me wrong?" *Id.* at 677–78. Moreover, it does not necessarily follow that Hochrein's admission he understood upon investing in Cepeda Minerals that such investment was a "high risk investment" that Hochrein was an "aggressive, speculative" investor, nor that "aggressive, speculative investors" are, by definition, "sophisticated" investors. To the contrary, other factors which may motivate aggressive and speculative investment include greed, a desperate need for a quick influx of a large amount of cash, or unrealistic ideas as to the function of the securities markets. It is also significant that of the remaining three Claimants, Arakis stock was only the second publicly traded stock owned by John Clubine, and neither Brunet nor Scarpone had previously owned any stock.

Assuming, *arguendo,* that the arbitrators were aware of the ten-day notice clause and that enforcement of such clause was a "clearly applicable law," that the facts of the case demonstrate a dispute as to the Claimants' sophistication in margin investing can be construed as implying that the arbitrators determined that "a disparity in sophistication" existed between Gwynn and Claimants, such that enforcement of the ten-day clause was not required. *See Westerbeke, supra,* at 209. Even if such factual determination was incorrect, the court cannot disturb it as under the manifest disregard of the law doctrine, the clearly applicable law must apply to the facts *"as those facts have been determined by the arbitrator."* *Westerbeke, supra,* at 213 (italics in original) (citing *Wonderland Greyhound Park, Inc. v. Autotote Sys. Inc.,* 274 F.3d 34, 36–37 (1st Cir.2001)) ("An arbitrator's factual findings are generally not open to judicial challenge, and we accept the facts as the arbitrator found them."). Nor is an erroneous factual determination a ground for vacating an arbitration award. *Id.* (citing *ConnTech Dev. Co. v. Univ. of Conn.*

*Educ. Props., Inc.,* 102 F.3d 677, 687 (2d Cir.1996)). *See also Siegel, supra,* at 893 (under the courts' limited scope of review of arbitration awards, the courts are bound by the arbitrators' factual findings) (citing *South East Atlantic Shipping, Ltd. v. Garnac Grain Co.,* 356 F.2d 189, 192 (2d Cir. 1966)).

At least a "barely colorable justification" for the arbitrator's failure to uphold the ten-day notification clause under the circumstances presented in the instance case. Accordingly, the court next considers whether the evidence supports a determination that Gwynn failed to see to the execution of a "stop loss" order.

 The record demonstrates conflicting accounts as to whether Claimants ever requested Gwynn to place a "stop loss" order on the Arakis stock directing the sale of Claimants' shares of Arakis stock if the per price share fell to $ 18 per share. Claimants maintain that on August 7, 1995, William Clubine instructed Gwynn to place the stop loss order, but that Gwynn failed to see that the stop loss order was placed. Significantly, Gwynn admitted at the arbitration hearing that he completed trade tickets and left instructions with Moldermaker to sell Claimants' Arakis stock if the price fell to $ 18, but that Moldermaker failed to follow through with Gwynn's instructions. Arbitration Record, Vol. 1, Tab 2 at 187–192. Further evidence presented to the arbitration panel included a tape recording of a telephone conversation between Gwynn and Hochrein in which Gwynn stated that Moldermaker failed to forward to Southwest Claimants' account numbers necessary to execute the stop loss order.[10] Claimants' Exh. J at 47.[11] During the conversation, Gwynn, in response to Hochrein's direct inquiry as to whether a stop loss order had been placed on the Arakis stock at $ 18 per share, Gwynn stated "[r]ight. I put a stop/loss on all the margin accounts." Claimants' Exh. J at 12, lines 14–15. Gwynn further stated he placed the stop loss order "to make sure that none of my clients were going to get whacked." Claimants' Exh. J, at 12, lines 19–20. In contrast, Gwynn asserts that Claimants' actions pertaining to the Arakis stock after August 7, 1995, including buying and selling Arakis stock at prices below $ 18 per share, and failing to complain until October 1995 that Gwynn did not execute the stop loss order, are inconsistent with Claimants' assertions that Gwynn failed to comply with the stop loss order request. Plaintiff's Memorandum at 20–23; Plaintiff's Reply Memorandum at 6–7.

As discussed, under the manifest disregard of the law doctrine, the court is not permitted to disturb the arbitrators' determination of the facts, *Westerbeke, supra,* at 213 (citing *Wonderland Greyhound Park, Inc., supra,* at 36–37). Nor is an erroneous factual determination a ground for vacating an arbitration award. *Id.* (citing *ConnTech Dev. Co., supra,* at 687;) *Siegel, supra,* at 893 (citing *South East Atlantic Shipping, Ltd., supra,* at 192). There is, then, at least a colorable ground on which the arbitrators could conclude that Claimants placed a stop loss order on their

---

10. Gwynn does not challenge the authenticity of the transcript of the telephone conversation. Significantly, arbitrators are not bound by the rules of evidence. *GTFM, LLC v. TKN Sales, Inc.,* 257 F.3d 235, 243 (2d Cir.2001) (citing *Bernhardt v. Polygraphic Co. of America,* 350 U.S. 198, 203 n. 4, 76 S.Ct. 273, 100 L.Ed. 199 (1956)).

11. References to "Claimants' Exh." are to the exhibits attached to Claimants' Appendix in Support of Motion to Confirm Arbitration Award and Opposing Motion to Vacate filed on January 31, 2003.

shares of Arakis stock, but that Gwynn failed to carry out the request.[12]

The record thus supports a determination that Gwynn failed to follow through with Claimants' request that a "stop loss" order directing the sale of the Arakis stock once the per price share fell to $ 18. Furthermore, as discussed, Discussion, supra, at 17, Gwynn does not dispute that the failure to execute a requested "stop loss" order would support a recovery based on Texas common law legal theories of breach of contract, negligence or breach of fiduciary duty, and statutory fraud under Tex. Bus. & Com.Code § 27.01. Accordingly, Gwynn's petition to vacate the Arbitration Award for manifest disregard of the law should be DENIED.

### B. *Manifest Disregard of the Evidence*

 Gwynn argues the Arbitration Award was made in manifest disregard of the evidence presented at the hearing, including evidence conclusively demonstrating Claimants actions with regard to their margin accounts were "entirely inconsistent with their claim of having entered a stop loss order." Plaintiff's Memorandum at 19. In particular, despite Claimants' assertion that on August 8, 1995, Claimants entered a "stop loss" order directing the sale of the Arakis stock if the price fell to $ 18 per share, the record establishes that on August 8, 1995, Claimants bought and sold Arakis stock at less than $ 18 per share. *Id.* William Clubine and Hochrein executed additional trades of Arakis stock on August 21, 1995, buying shares at $ 17 per share, and later selling at $ 11.50 per share and $ 13.87 per share. *Id.* Michael Brunet sold shares of Arakis stock on Au-

gust 21 and 22, 1995 at $ 12 per share. *Id.* According to Gwynn, the transactions are inconsistent with Claimants' assertion that a stop loss order had been placed on the Arakis stock.

In support of his manifest disregard of the evidence argument, Gwynn relies on *Halligan v. Piper Jaffray, Inc.,* 148 F.3d 197 (2d Cir.1998), in which the Second Circuit reversed the district court's decision confirming an arbitration award made under the Age Discrimination in Employment Act in favor of the plaintiff's former employer because in making the award, the arbitrators "ignored the law or the evidence or both." Halligan at 204. Similar to the instant case, the arbitrators failed to explain the reasons for the challenged arbitration award at issue in *Halligan. Halligan, supra,* at 204. The Second Circuit stated in *dicta* that "where a reviewing court is inclined to find that arbitrators manifestly disregarded the law or the evidence and that an explanation, if given, would have strained credulity, the absence of explanation may reinforce the reviewing court's confidence that the arbitrators engaged in manifest disregard." *Id.* Specifically, in *Halligan,* although the former employer maintained the plaintiff had voluntarily resigned, the evidence presented by the former employee was "consistent only with a finding that Halligan was pushed out of his job." *Id.* at 203.

In contrast, in the instant case, as discussed in connection with Gwynn's manifest disregard of the law claim, conflicting evidence was presented at the arbitration hearing regarding the existence of the stop loss order. The conflicting evidence is not consistent solely with a finding that no stop loss order had been placed. In par-

---

12. The parties do not discuss, and nothing in the record indicates, whether Claimants' failure to complain about the challenged trades, in writing within ten days of such trades,

negates a securities broker's liability for failing to execute a client's request for a "stop loss" order.

ticular, the Arakis stock transactions Claimants made after the stop loss order was allegedly placed can be construed as attempts by Claimants, as unsophisticated investors, to reclaim some of the losses incurred when the stop loss order was not executed. This is corroborated by Claimants' assertions that Gwynn initially refused to sell Claimants' Arakis stock in accordance with William Clubine's request in late July 1995 and Clubine's eventually acquiescence based on Gywnn's assertions that the Arakis stock would rebound. Claimants' Memorandum at 6–7 (citing Claimants' Exh. F at 80–81, and Exh. I at 519–92).

Accordingly, there is no merit to Gwynn's assertion that the Arbitration Award was made in manifest disregard of the evidence and the motion to vacate should be DENIED on this ground.

### 4. *Attorney and Expert Witness Fees*

 Included in the Arbitration Award were $ 150, 742 in attorney fees and $ 18,-000 in expert witness fees. Gwynn argues that there is no legal authority supporting the arbitrators' awarding attorney and expert witness fees to Claimants. Plaintiff's Memorandum at 18; Plaintiff's Reply at 7–8. Claimants urge the court to uphold the award of attorney and expert witness fees under Texas law as the Margin Account Document provides that the rights and liabilities of the parties are to be construed under the laws of the State of Texas. Claimants' Memorandum at 24. According to Claimants, Texas law permits recovery of both attorney and expert witness fees for statutory fraud claims, Tex. Bus. & Com.Code § 27.01(e), as well as for breach of contract claims, Tex. Civ. Prac. & Rem. Code § 38.001 *et seq. Id.* Gwynn, however, asserts that the arbitrators should not have applied Texas law given that Gwynn was not a party to the Margin Account Document executed between Claimants and Southwest, that Gwynn's office was in Arizona, that Claimants were residents of Ontario, Canada, and that the arbitration proceeding was brought in Buffalo, New York. Plaintiff's Memorandum at 18; Plaintiff's Reply Memorandum at 7–8. Gwynn further maintains that the arbitration panel never specified that it was relying on Texas law. *Id.*

The Margin Account Document's choice of law provision states "[t]his agreement shall be deemed to have been made in the State of Texas and shall be construed, and the rights and liabilities of parties determined, in accordance with the laws of the State of Texas." Margin Account Document ¶ 20. Texas law governing fraud in stock transactions provides that "[a]ny person who violates the provisions of this section shall be liable to the person defrauded for reasonable and necessary attorney's fees, expert witness fees, costs for copies of depositions, and costs of court." Tex. Bus. & Com.Code § 27.01(e). Texas law also provides for the recovery of attorney fees for breach of contract. Tex. Civ. Prac. & Rem.Code § 38.001(8).

The Margin Account Document requires application of Texas law to any dispute arising thereunder. Margin Account Document ¶ 20. Accordingly, the arbitration panel was not required to specify it was relying on Texas law in awarding Claimants attorney and expert witness fees. Further, Gwynn's assertion that the Margin Account Document's choice of law provision does not apply to him as Gwynn is not a party to the Margin Account Document is inconsistent with Gwynn's reliance on ¶ 18 of the Margin Account Document in support of Gwynn's argument that Claimants' failure to object in writing within ten days to Gwynn's failure to execute the "stop loss" order precluded Claimants from bringing such claim to arbitration.

Gwynn points to no legal authority supporting application of only those provisions of a document that are favorable to him, while allowing Gwynn to avoid liability otherwise applicable under a less favorable provision of the same document. Accordingly, both the Margin Account Document and Texas law support the award of attorney and expert witness fees and this aspect of Gwynn's motion should be DENIED.

## 5. *Request for Alternative Relief*

 In the event the court denies Gwynn's petition to vacate the Arbitration Award and grants Claimants' motion to confirm the Arbitration Award, Gwynn alternatively requests discovery as to how much money Claimants recovered from Gwynn's co-respondents in the arbitration proceedings who settled their disputes with Claimants. Bozer Reply Declaration ¶¶ 10–21. According to Gwynn, as the Arbitration Award determined that Gwynn and the co-respondents were jointly and severally liable for the money awarded Claimants, and as the terms of the settlement agreements are confidential, without court ordered discovery permitting Gwynn to determine the terms of the settlement agreements and how much of the Arbitration Award Claimants have already recovered through the settlements, Gwynn cannot determine "what amount, if any, remains due and owing under that award." Bozer Reply Declaration ¶ 14. Claimants have not responded to this request.

The only legal authority Gwynn points to in support of this request is Rule 56(e) which permits the court to grant discovery needed by a party seeking to avoid summary judgment. In this action, however, no motion for summary judgment has been filed. Accordingly, Rule 56(e) is inapplicable. Nor does Gwynn point to any legal authority under the FAA allowing him access to sealed settlement agreements to determine how much of an arbitration award has been satisfied through settlement with co-respondents who were held jointly and severally liable for such award and the court's research reveals none. In essence, Gwynn is requesting the court make an apportionment of liability as to each co-respondent's fault regarding the arbitration award. The court, however, is without such authority as, under the FAA, the court may only vacate or modify an arbitration award based upon the grounds contained in 9 U.S.C. §§ 10 and 11, and neither section 10 nor 11 permits modification to provide for such apportionment. *See Ottley v. Schwartzberg,* 819 F.2d 373, 376 (2d Cir.1987) (absent statutory basis for modification or vacatur, district court's task when presented with arbitrator's determination and final award was to confirm arbitrator's award as mandated under Federal Arbitration Act).[13] The court takes no position as to whether Gwynn should pursue this issue through further arbitration, or by commencing a separate action for contribution against his co-respondents and joint tortfeasors under Texas law, *see, e.g.,* N.Y. Gen. Oblig. Law § 15–108 (McKinney 2001); *see also Rock v. Reed–Prentice Division of Package Machinery Co.,* 39 N.Y.2d 34, 382 N.Y.S.2d 720, 346 N.E.2d 520, 524 (1976) (tortfeasor's settlement with injured party does not shield settling tortfeasor from enforcement of judgment for contribution made in separate contribution action), in a court where Gwynn can obtain personal jurisdiction over the Claimants.

---

**13.** The record does not indicate that Gwynn ever requested that the arbitration panel make a determination apportioning the amount of any award among the co-respondents based on fault.

## CONCLUSION

Based on the foregoing, Gwynn's motion to strike (*Gwynn*, Doc. No. 34), is DENIED; Gwynn's motion to sever (*Gwynn*, Doc. No. 38; *Clubine*, Doc. No. 66), is DISMISSED as moot in part and GRANTED in part; Claimants' motion to strike (*Gwynn*, Doc. No. 31; *Clubine*, Doc. No. 62), is GRANTED; Claimants' motion to modify the scheduling order (*Gwynn*, Doc. No. 41; *Clubine*, Doc. No. 71), is GRANTED *nunc pro tunc*. Gwynn's petition to vacate the Arbitration Award (*Gwynn*, Doc. No. 1), should be DENIED; Claimants' petition to confirm the Arbitration Award (*Clubine*, Doc. No. 1), should be GRANTED. The Clerk of the Court should be directed to close both cases, 02–CV–0073A(F) and 02–CV–00557A(F).

SO ORDERED, as to the motions to strike, to sever, and to modify the scheduling order,